WEINHART *v.* WEINHART.

1. DIVORCE—EVIDENCE HELD TO SUPPORT FINDING THAT PARTIES ARE IRRECONCILABLY ESTRANGED.

   In husband's suit for divorce, where the wife filed a cross-bill, the conclusion of the court below that the parties have become so entirely estranged as to subvert their marital relations beyond reconciliation, *held*, sustained by the record.[1]

2. SAME—APPEAL HEARD DE NOVO—CONSIDERATION MAY BE GIVEN TO ADVANTAGES OF COURT BELOW.

   Although the Supreme Court hears a divorce case *de novo* on the printed record, on appeal, the advantage which the trial court had of seeing the parties and their witnesses, hearing their testimony, and noting their manner of testifying may be taken into consideration.[2]

3. SAME—DECREE OF COURT BELOW NOT DISTURBED WHERE EVIDENCE CONFLICTING.

   Where the testimony as to the misconduct of the parties was very conflicting, the decree of the court below granting a divorce to the wife on the ground of extreme cruelty, will not be disturbed, on appeal, in view of the advantage of the court below in seeing and hearing the parties and their witnesses.[3]

4. SAME — ALIMONY REDUCED WHERE UNUSUALLY LARGE AND BURDENSOME.

   An award of $100 per month to the wife as permanent alimony, $50 per month for the support of their daughter who remains in the wife's custody, and requiring the husband to pay off the mortgage on the home, which, with the furniture therein, was also awarded to the wife, *held*, unusually large and burdensome, in view of the husband's circumstances, and the award of $100 per month is therefore reduced to $50.[4]

Appeal from superior court of Grand Rapids; Dun-

[1]Divorce, 19 C. J. § 344; [2]Id., 19 C. J. § 478; [3]Id., 19 C. J. § 479; [4]Id., 19 C. J. § 614.

On effect of relations between one spouse and relatives of the other as affecting the question of cruelty in action for divorce, see notes in 13 L. R. A. (N. S.) 222; 34 L. R. A. (N. S.) 759; L. R. A. 1915E, 161.

ham (Major L.), J., presiding.    Submitted June 4,
1924.    (Docket No. 19.)    Decided December 31,
1924.

Bill by Clarence A. Weinhart against Ruth S. Wein-
hart for a divorce.    Defendant filed a cross-bill for
a divorce.    From a decree for defendant, plaintiff
appeals.    Modified and affirmed.

*Rodgers & Rodgers* and *George S. Norcross*, for
plaintiff.

*Knappen, Uhl & Bryant* and *James T. McAllister*,
for defendant.

STEERE, J.    The parties to this suit were married
in Erie, Michigan, August 28, 1911.    They have one
child, a daughter named Phyllis, born at Adrian, Mich-
igan, March 14, 1913.    Soon after her birth they
moved to Grand Rapids where they have since resided.
When they were married neither owned any property.
He was a traveling salesman earning $100 a month.
She was a young woman 19 years old with an
eighth grade education.    Plaintiff was evidently in-
dustrious and possessed of some business ability.    It
is undisputed that he provided well for his family and
as his earning powers increased defendant was sup-
plied accordingly, not only in appurtenances of their
home but in clothing, jewelry, means of travel and en-
tertainment.    At the time of this hearing he was
an officer in a coal company and had accumulated some
means.

The testimony is persuasive that their married life
was at intervals turbulent.    Their final separation
took place in February, 1922.    Plaintiff filed this bill
for divorce January 29, 1923, alleging as ground there-
for extreme cruelty.    Defendant answered with re-
ciprocal charges followed by various petitions, amend-

ments, etc., the voluminous pleadings occupying many pages of this ample record of over 350 pages. The case was brought to hearing January 16, 1924, on pleadings and proofs taken in open court. The court thereafter rendered a decision dismissing plaintiff's bill and granting defendant a divorce on her cross-bill, with a generous award of alimony in proportion to plaintiff's resources which is one of the paramount issues in this appeal. While anxious for a divorce plaintiff contends that the overwhelming weight of evidence entitles him to it rather than defendant and, though willing to properly support their child and apparently not wholly adverse to a reasonable allowance of alimony commensurate with his resources, he claims the magnitude of the award by the court leaves him stripped and naked to his enemies.

Their domestic troubles had figured in the courts prior to this suit. In 1917, defendant filed a bill for divorce against plaintiff charging him with various acts of domestic cruelty and abuse, including frequently cursing her and calling her vile names without provocation, and obtained a temporary injunction restraining him from coming near their home. He filed an answer of denial with cross-bill asking a divorce from her, charging extreme cruelty, setting up many of the grounds of misconduct alleged in the instant case including the claim that their home life had been disturbed almost from the beginning by her insisting on having her mother and sisters live with them and running their home largely for their benefit, her mother who lived with them most of the time particularly assuming a dictatorial attitude in their domestic affairs, calling him a bull-dog which she proposed to train and otherwise making life unpleasant for him. A singular feature in that connection is defendant's testimony in the instant case that up to the time of her filing her bill in 1917 the relations between herself and her husband were "very happy;" they "lived as

well as any couple could starting out with the small amount we had," and she filed that bill "because he wanted me to and because he requested it."   While the bill was pending she made complaint against him to a Masonic lodge of which he was a member, and wanted him dropped from the order.   Through the intervention of friends they became reconciled, resumed their marital relations and the divorce proceedings were dismissed.   In the early part of 1922 their differences reached a stage where plaintiff withdrew from his home and took quarters elsewhere under circumstances which are in dispute, he claiming she ordered him to go, which she denies.   He thereafter contributed to the support of his wife and child, amply as he claimed, which she denied and later filed a petition for separate maintenance.   He answered with a cross-bill asking divorce.   The case was brought to issue and heard, the court announcing an opinion that in view of the support she had received she had not made out a case for separate maintenance, nor had defendant satisfactorily maintained the affirmative of his claim for a divorce under his cross-bill.   Before any decree was signed defendant made a motion for leave to withdraw his cross-bill which was granted.   Other proceedings which need not be detailed followed before the hearing involved here was had.   Defendant's plea of *res adjudicata* based on the preceding litigation was denied upon this hearing, properly, we think, and the case finally heard in full on plaintiff's bill and defendant's answer with cross-bill.

The record convincingly sustains the conclusion of the trial court that these parties have become so entirely estranged as to subvert their marital relations beyond reconciliation.   It is equally evident that the primary trouble which led to the ultimate entire subversion of those relations was the extent to which her mother and sisters became and continued members of their household and took a disturbing part in their

domestic affairs first against his private protests to his wife and later in open dissentions in which she arrayed herself with them and stubbornly insisted on their remaining.    We fully agree with the conclusions of the trial court that "this fact caused almost constant friction between plaintiff and the defendant," and in the manner of their stubborn insistence "both of these parties made a serious mistake."

But beyond that, if both could be believed, each was also guilty of such gross misconduct, extreme cruelty and abuse of the other as to furnish each ample grounds for divorce.    While in contested divorce cases it is not uncommon for the testimony of the respective parties to magnify or minimize facts and be opposed in many respects, yet this record presents an extreme case.    Many of the more serious charges on both sides are only known to the contending parties and of such nature that there could be no honest mistake as to the fact or facts.    They are positively asserted and flatly denied by the respective parties.    The trial court speaks of the good qualities of each in impartial terms and says that, "Both of these parties have excellent reputations and entitled to it."    Nevertheless a careful reading of this record is convincing that at least one of them was guilty of wilful perjury, but without sidelights in the printed page convincingly disclosing which one.    No useful purpose can be served by an attempt to detail or analyze their lengthy and conflicting testimony of each other's wrongdoing.    The trial court had the advantage of seeing the parties and their witnesses during the progress of the trial, with opportunity to hear their testimony as it developed and note their manner of testifying.    Although this court hears the case *de novo* on the printed record, that advantage is an element which may be taken into consideration.    While able counsel on each side made convincing presentation of their positions with the testimony of their respective clients taken as a *major*

*premise* of their syllogisms, on this record considered in its entirety we are not disposed to disturb the conclusions reached by the trial court in awarding a divorce to defendant.

The testimony is not so seriously in conflict as to the financial condition of plaintiff at time of the hearing. He owned their home where defendant was living with her mother and their daughter, consisting of a house and lot on Byron street, worth from $8,000 to $10,000, fully furnished by him at an expense of over $3,000, on which was a mortgage of $3,600; a lot in Muskegon valued at $400, 25 shares in the coal company with which he was connected valued at $2,500, and a contingent ownership of 37½ shares more placed in escrow, to be given him if he remained in the service of the company 10 years, and was receiving a salary from said company of $300 per month. He also owned a half interest in an automobile valued at $500, five bonds valued at $4,000 and scattering shares of stock in small amounts making the gross amount of his property as first found by the court to be "about the sum of $31,000," and computed in another section of the opinion at $29,900. His own inventory of his property was $31,524. The undisputed amount of his indebtedness as shown by him was $11,400. His stocks and bonds were mostly hypothecated to secure his indebtedness.

The court awarded to defendant as permanent alimony the sum of $100 per month to be continued during her life unless she should remarry, and their home with its furnishings, requiring plaintiff to pay the mortgage thereon of $3,600 according to its terms, of $150 every 3 months until paid in full with 6 per cent. interest on deferred payments; also $400 for her reasonable attorneys' fees, the taxable court costs and $740.10 of bills which had been incurred by her, awarded custody of their daughter to her, requiring him to pay $50 each month for her support until she

should arrive at the age of 18 years, and authorized execution to enforce collection of the sums awarded if not paid as they became due.

When the decree was filed defendant was about 32 years of age, with a life expectancy of about 33 years according to mortality tables, and their daughter 11 years old. Taking into consideration the $600 per year to the daughter for 7 years and $1,200 per year to defendant for life, the financial obligations imposed upon plaintiff by the decree far exceeded his entire assets. But more closely on the basis of present worth and earnings, his salary was $3,600 a year and the court decreed that during the first year thereafter he must pay items amounting to $3,540.10 leaving him $59.90 out of his wages, and for the immediately succeeding 6 years he is required to pay $2,400 each year or two-thirds of his earnings. His accumulations are not in money, but mostly in and subject to the hazards of commercial or manufacturing enterprises. One of his listed obligations was a note given to the cashier of a bank in connection with an overdraft. The coal company in which he is interested and by which he was employed had experienced a degree of prosperity in the abnormal period of price inflation resulting from the recent war, but at the time this suit was heard it was not paying dividends or making any money.

An examination of many cases involving award of alimony leads to the impression that the award made here is in proportion to the circumstances of plaintiff as shown by this record unusually large and burdensome. Defendant is given their well furnished home in good repair for which plaintiff must pay in full, and $50 per month is awarded for support of the daughter, allowed to remain in her custody. The trial court has properly reserved the right to review the award, but under the financial circumstances of plaintiff as now shown we are of opinion that the

permanent alimony awarded defendant should be reduced to $50 per month.

So modified, the decree will stand affirmed, with costs of this court to be borne by plaintiff.

CLARK, C. J., and MCDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.